FILED
01/08/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 12, 2024 Session

## JAMES W. GRUBB, ET AL. v. JOE D. GRUBB, ET AL.

**Appeal from the Chancery Court for McMinn County**
**No. 2017-CV-150     J. Michael Sharp, Judge[1]**

---

**No. E2023-01358-COA-R3-CV**

---

This appeal concerns the end of a business relationship between two brothers, Joe D. Grubb ("Joe") and James W. Grubb ("Jim").[2]  After many years of working together in the cash advance and rent-to-own businesses, Jim sued Joe in the Chancery Court for McMinn County ("the Trial Court"), asserting breach of contract, intentional interference with business relationships, breach of fiduciary duty, and equitable relief under the LLC dissolution statute.  Joe sued Jim in turn.  One of the chief issues concerned Jim's claim to equal compensation from the brothers' businesses based on an alleged express oral agreement with Joe.  After a trial, the Trial Court found in favor of Jim, awarding him damages based on multiple grounds.  Centrally, the Trial Court found that an express oral agreement between Jim and Joe provided for equal compensation, even though Jim testified that the alleged agreement was "unspoken" and "just the way it's been."  Joe appeals.  We hold, *inter alia*, that notwithstanding the Trial Court's factual findings and credibility determinations in favor of Jim, what Jim testified to did not constitute an express oral agreement or any other kind of contract as a matter of law.  Jim's alternative theories for relief are unavailing as well.  We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Donald J. Aho, William P. Eiselstein, Meredith C. Lee, and Robert F. Parsley, Chattanooga, Tennessee, for the appellant, Joe D. Grubb.

---

[1] Sitting by interchange.

[2] The parties refer to themselves by first name in their briefs.  For the sake of convenience in this familial litigation, we adopt this practice too.  We mean no disrespect in doing so.

Gary R. Patrick and Jeremy M. Cothern, Chattanooga, Tennessee, for the appellee, James W. Grubb.[3]

## OPINION

## Background

In 1985, Joe, along with his father Dennis and uncle Wayne, formed the rent-to-own company E-Z Rentals, Inc., the first Grubb family business. Later, Joe bought his uncle's shares in E-Z Rentals, Inc., and thereby came to own 80% of the company to Dennis's 20%. In 1993, Joe and his younger brother Jim formed another rent-to-own business, A Plus, Inc., of which Jim owned 51% and Joe 49%. The brothers went on to form other companies. One dispute in this case is whether Joe and Jim contracted for equal compensation from their companies. Jim says that there was such an agreement; Joe says that there was none.

In the late 1990s, Joe and Jim entered the cash advance industry by forming American Cash Exchange Enterprise, LLC, owned equally by the brothers. Joe and Jim formed two additional cash advance entities. In 2003, Joe and Jim formed A Plus, LLC, a rent-to-own business, which they owned equally. Joe and Jim also formed FOG, or "Family of Grubb," a management entity. With the advent of FOG, Joe and Jim were paid by their LLCs through management fees put into a bank account held by A Plus, Inc., then split between Joe and Jim. Whether these payments constituted W-2 salary, as Joe argues, or distributions under the LLC statutes, as Jim argues, is another disputed issue. Meanwhile, Dennis and the brothers' mother, JoAnn, loaned money to the businesses.

In 2012, Dennis and JoAnn rejected an estate planning proposal set up by Joe. According to Jim, this event triggered the deterioration of the family relationship, with Joe eventually firing his parents from their company jobs. Joe contends that the real cause of the breakdown was Jim's "disruptive behavior," such as berating company employees. In any event, the relationship between Joe and Jim broke down. In August 2015, Jim asserted control over A Plus, Inc., and severed its ties to FOG. In addition, Dennis and JoAnn sued to enforce their promissory notes.

In April 2017, Jim sued Joe in the Trial Court asserting breach of contract, intentional interference with business relationships, breach of fiduciary duty, and equitable

---

[3] Appellees A Plus Rentals, LLC, American Cash Exchange Enterprise of Virginia, LLC, Dennis Grubb, and JoAnn Grubb elected not to file a brief.

relief under the LLC dissolution statute. Joe, in turn, sued Jim and Dennis, asserting among other things that Jim had wrongfully claimed majority ownership of A Plus, Inc. In 2019, the parties amended their pleadings. Dennis filed a counterclaim against Joe alleging that he was being oppressed as a minority shareholder. Joe had A Plus, LLC and ACE-VA join him as counter- and third-party plaintiffs. The Trial Court ruled on motions for partial summary judgment, concluding, among other things, that Dennis and JoAnn's promissory notes were enforceable. In 2022, the parties revised their pleadings further. This matter was tried over the course of eleven days in August and September of 2022.

The major issue at trial concerned a purported agreement between Joe and Jim to equal compensation. Jim testified that such an agreement existed:

Q. And did you and Joe have any kind of understanding or agreement with respect to your compensation from these jointly-owned companies?
A. We would be paid the same.
Q. That you would be paid the same?
A. Yes.
Q. And in fact, were you paid the same?
A. From -- yes.
Q. Okay. Was that agreement in writing anywhere?
A. No. It's just the way it was.
Q. Had both of you agreed on that?
A. Yes, yes.

On cross-examination, Jim was pressed on the details of the purported agreement. Jim testified:

Q. (By Mr. Aho:) So you never described your compensation as salary, right?
A. You just said, I believe -- I don't recall that. I've always called it owner's compensation, to my knowledge. But in an environment -- in a different environment, maybe I would have. I don't know. I view it as owner's compensation, though.
Q. And you also got paid in the form of bonuses, correct?
A. Yes. Most of those bonuses were the year-end bonus that we injected back in as capital. It came in in December and we injected it back into capital in January.
Q. Exactly, Mr. Grubb. And you testified how you and Joey came up with that system of paying those bonuses to you, right, yesterday?
A. I don't know that -- well, I don't know that we came up with it. It was something that was brought to us and, yes, that's what we did. It's common sense to try to save the state taxes if possible.

Q. Sure. And you testified yesterday that that bonus structure saved you money, correct?

A. Saved the taxes that we didn't have to pay because there was no profit to the state -- in the state entities.

Q. So you mentioned the term equal compensation rather than salary. It's your position today that you had an express agreement with your brother that you would be paid equally from the jointly-owned entities, right?

A. Expressed as well as -- yes, expressed as well as it's the way it had been done since I believe '93, 1993.

Q. So let's talk about that. Do you know what an express agreement is?

A. Please tell. No, sir.

Q. Well, you used the term in one of your pleadings. Do you know what it means?

A. Expressed?

Q. Yeah. Well, let's put it this way. You don't have a written agreement between you and your brother or you and any of the entities that says that you'll get the same compensation as Joe Grubb, correct?

A. No. There's no written agreement to the contrary either.

Q. Yeah. But the answer to my question is yes, correct, you do not have a written agreement between you and Joe or you and any of the entities that says you and Joe will receive the same compensation?

A. No. It's just the way it's been since '93.

Q. Are you saying, then, that it's an oral agreement?

A. I'm not saying that, but it's an agreement that we have.

Q. Well, if it's not written, it's got to be oral, right?

A. It's the way it was done. Yes, I believe there is an agreement, an unspoken agreement that that's what we make, we make -- we have equal compensation in the 50/50 entities. It's what we have done from '93 to 2015. It changed in 2015.

Q. Is that just like your unspoken agreement about rolling notes?

A. I don't think that was an unspoken agreement with rolling notes. The agreement ended and it was re-loaned per the instructions on the promissory notes.

Q. So is it your testimony that there was some sort of course of dealing between you and your brother, that that's the way you were going to do it?

A. It's the way we --

Q. Yes?

A. Yes, it's the way we did it, yes.

Q. Right. And you said it was an unspoken agreement, right? Yes or no, sir?

A. Can I -- I want to think and clear my mind.

Q. Go right ahead.

-4-

A. Well, thank you. It's the way it was done. When I use the term unspoken agreement, we knew that's what we wanted to do since '93 and that's what we did. So I've never thought of unspoken agreement, and I did use that term, but yes, we had an unspoken agreement, I guess.

Q. So, Mr. Grubb, are you aware that in your Second Amended Complaint the term express agreement is used?

A. I am now. I don't guess I was prior till now. I probably read it, but it didn't hit me. I assume it was referring to the way we were being paid.

Q. So I want to be clear, because you understand that an express agreement is an agreement where terms have been expressly agreed upon, correct?

A. I'd already told you I wasn't real sure what express agreement meant, exactly what it meant.

On re-direct examination, Jim was asked further about the unspoken nature of the agreement. Jim answered:

Q. Now, you said that -- you used the term, and I think Mr. Aho repeated it 50 times, it was an unspoken agreement. Do you recall the specific date when you and Joe discussed back in 1993 the fact that you would both be paid equal compensation, do you remember that date?

A. I don't remember the date, but it was around the time that the entity was formed.

Q. Okay. You don't remember the month, or the office, or anything, I mean, 30-something years ago?

A. No.

Q. Okay. But did you have -- let me ask you this way. After that was done in 1993, did you regularly talk about equal compensation all during those years?

A. We didn't have a lot of discussions about it. It was just what happened. We had the early discussion, and we were paid the same up until 2015.

Q. Okay. Is that what you were talking about when you said unspoken?

A. Yes.

Q. Okay. It was just something that was always done after that?

A. Yes.

Q. Okay.

A. We were already doing it. We could have talked about doing it, but we'd done it, we'd done it for years, for a decade.

Q. Was there any reason to talk about equal compensation at that time?

A. At that time, no.

Another issue was the nature of Joe's and Jim's compensation. Jim contends that these payments were distributions to which he is entitled to his share, while Joe argues that the payments constituted W-2 salary for services performed. Joe's expert, Robert Reilly ("Reilly"), testified to the distinction between distributions and salary:

Q. So again, in the context of a limited liability company, can you explain the distinction between compensation and a distribution, as you understand it, in finance and accounting and advising LLCs for their --
A. Yes. And this is absolutely not a legal opinion. I'm not going to give a legal opinion to somebody wearing a robe, I'll tell you that. It's an easy distinction. It comes from two numbers. There's a W-2 and there's a 1099. It's as simple as that. That's an accounting issue. Right? Compensation is reported on a W-2. So when an owner of a company works for the company as an employee and provides employee services, compensation for employee services is reported on a W-2. Okay? So the employee knows that, and the Internal Revenue Service knows that.

Additional amounts that are paid from the company that could be dividends, a return on stock, a return on debt, or any other distribution of assets, but that don't -- don't involve employment, you know, payment for employment services, are reported on a 1099. Right? And that's any other payment other than compensation for employment services.
Q. And in your experience, is an LLC typically required to make distributions of profits to its owners?
A. No. In my experience, most LLCs don't. They're certainly not required to. Unless there's some contract between the LLC members in the company.
Q. Based on your knowledge of accounting and financial reporting, and your experience advising thousands of LLCs and small companies, does an owner of an LLC have equal financial rights or right to equal financial benefits in the company?
A. Well, no. And before this case -- and I've been practicing, as I say, for over 46 years -- I've never heard of the concept of equal financial rights before I started working on this case. It's not an accounting concept. It's not an evaluation concept. It's not a financial concept. It's not an economic concept.

So the owner of an LLC does have the right, to the extent there is a distribution made to any of the LLC members, all of the LLC members would receive distributions pro rata, meaning according to their proportion of ownership of the LLC membership interests. That would be an equal right to receive a pro rata distribution as long as any member gets a distribution, all members get a distribution pro rata.

But with regard to compensation, then there's no either pro rata allocation or allocation at all related to ownership. In other words, compensation is paid for services rendered whether you are an employee, or an owner, or an employee non-owner, you get paid compensation for the services you performed. If you don't perform services, if you're not an employee, you don't receive compensation.

Q. So -- and then if a company chooses to make distributions, would a distribution be made before or after taking into account salaries?

A. Well, a distribution is made from net income. Right? So a distribution is always after the payment of all expenses, including salary expense. A salary expense would be no different than repair and maintenance expense, an inventory supply expense, a rent expense. All of the expenses are paid for first, including compensation to all employees, owners and otherwise. You get to net income, and then the distribution is made out of net income.

In his detailed report, included as an exhibit in the record, Reilly concluded that Joe was reasonably compensated for his services. On the other hand, Jim's expert, Brett Cooper, a CPA and specialist in forensic accounting, testified to his view that Jim and Joe agreed to be paid equally from their jointly owned companies based on his review of the financial documents.

At trial's end, the Trial Court asked the parties to submit post-trial briefs, saying: "I know you-all stipulated this, and we'll talk more about some of that just in a minute, but that you-all are going to provide to me your post-trial proposed findings of fact and conclusions of law." The parties had agreed that "there shall be no opening statements or closing statements at trial, but closing arguments may be presented in a post-trial brief[.]" Ultimately, the Trial Court awarded Jim some $2.25 million in damages; dissolved some of the joint entities; required Jim to transfer his 50% stake in A Plus, LLC to Joe and Joe to transfer his 49% stake in A Plus, Inc. to Jim; and later calculated that Jim was entitled to attorney's fees and costs in the amount of $1,155,560.65. In its order, the Trial Court found, in part:

Ultimately, the court finds, and there is no contradictory evidence, that these parties now have irreconcilable differences. The court finds continuing the businesses as joint owners is not only impracticable, but probably unhealthy for each of the parties. The parties have ongoing disputes that have never been resolved, the parties apparently do not agree over general business operations, and the parties have been unable to agree on company management issues, effectively from 2013 until now.

The court finds that in March of 2015, Joe authored a memorandum wherein he wrote that "he did not want anybody handling any E-Z Rentals

information except himself or Ed Baird". However, the court finds that both Dennis and Wayne were shareholders at the time and were entitled to information. The court finds that Joe refused to give the shareholders the information that they were entitled to receive, and that Joe limited access to E-Z Rentals information to only himself and Mr. Baird. The court finds that at some point during this general time frame, Joe instructed in-house counsel Terry Lacey to obtain the law firm of Woolf McClane to conduct an internal investigation pertaining to what Joe believed to be misconduct by Dennis and Jim. This was done in late 2015 or early 2016. Ms. Lacey testified that during her term of employment by FOG, this was the only such internal investigation she was ever aware of that was conducted. Ms. Lacey could not identify any reason why Jim was being investigated, and Ms. Lacey testified that Woolf McClane did not submit any report summarizing their findings. Ms. Lacey testified that she was unaware of who actually paid for the internal investigation. The court notes that despite being a 50% owner, Jim was not consulted about this investigation prior to its commencement, nor given any information about it at any point.

The court finds that on June 15, 2015, at Joe's request, a special meeting of A Plus Inc. was held. Present at that special meeting were Jay Nicholas Arning, Jr., Jim, Mr. Armstrong as proxy for 3 of Jim's shares, and Mr. Baird as proxy for Joe. The court notes that Jim brought a motion to retain Dennis as secretary of A Plus, Inc. The court finds that Mr. Baird as proxy for Joe voted against that motion, as well as each of the motions proposed by Jim. The court finds that in August of 2015, Jim asserted control over A Plus Inc. After that period in time, Jim hired his father Dennis, who began working for A Plus Inc., performing the same duties that he had previously performed for all of the Grubb RTO businesses prior to his dismissal by Joe. The court notes that Dennis was not initially paid a salary for his work, but later began receiving a salary. Prior to August of 2015, Jim and Joe had been compensated equally for their jointly owned companies.

***

The court finds that Joe's repeated statements at various times referenced supra that A Plus LLC had insufficient monies to both pay Dennis and JoAnn's note and maintain adequate cash for business operations are not credible. The court finds that Joe's statements provide no known legal defense to paying the debt that he had already acknowledged was owed.

The court finds that all of Joe's actions described above demonstrate malice toward Dennis, JoAnn, and Jim.

Based upon all the above, the court does not find Joe's testimony to be credible that he did not intentionally or willfully harm A Plus LLC nor that he acted without self-interest with his operation of the family businesses. The court finds that Joe's actions did harm A Plus LLC, and the court cannot imagine how a person of Joe's intellect and knowledge of the business would not have seen and understood that his actions would harm A Plus LLC. The court finds that his actions were done willfully. The court finds that his payment of his legal fees and payments of his own note, as well as payments of certain income amounts to himself, were acting for his own self-interest in his overall operations of the family businesses, to the detriment of the other owners. The court finds that Joe's willful actions did not meaningfully reduce A Plus LLC's debt, and therefore avoidable interest continued to accrue. The court finds that these actions have harmed A Plus LLC and the other owners. The court finds that Joe has paid E-Z Rentals above market compensation for service fees, as set out above. Furthermore, the court finds that Joe has paid his own personal litigation expenses out of entity funds. Ultimately, the court finds that Joe has used his control over A Plus LLC and E-Z Rentals for his personal benefit and gain. The court finds that it is more likely true than not true that Joe has used his control over A Plus LLC and E-Z Rentals to stow A Plus LLC money in E-Z Rentals and in his personal accounts in an effort to remove A Plus LLC money from the legal claims of his family members. His actions have substantially harmed A Plus LLC and E-Z Rentals.

***

The court finds that Joe breached the equal compensation contract through management fees, paying his attorneys and expert fees with entity monies, and by paying service fees, all as found above. Furthermore, the court finds that the equal financial benefit (compensation) is also identified in additional causes of action, such as conversion, breach of fiduciary duty, etc. The court finds that Jim should recover equal financial benefits, legal and expert witness fees and service fees under the breach of contract count of his complaint.

Jim and Joe agreed, both orally and through their performance of the agreement between 1993 and August 2015, that they would each be compensated equally from the businesses they owned together (namely, A Plus Inc., A Plus, LLC, FOG, ACE-VA, ACE-SC, and ACE-TN). The court specifically holds Jim's testimony that there was an express oral agreement for equal compensation to be credible and Joe's testimony not to be credible on this point. The court further holds that their performance demonstrated

an agreement to be equally compensated. Both Joe and Jim received equal compensation from their jointly owned businesses from 1993 until August 2015. The court further holds that the brothers agreed that they each would be compensated equally from the jointly held companies irrespective of services rendered.

***

T.C.A. §48-202-101(15) defines "[d]istribution" as "a direct or indirect transfer of money or other property (except its own membership interests) with or without consideration, or an incurrence or issuance of indebtedness, (whether directly or indirectly, including through a guaranty) by an LLC to or for the benefit of any of its members in respect of membership interests." In this case, no enforceable document was entered into by the parties to modify these rights and Joe received direct and indirect transfers of money through management fees income, above market service fees, and the payment of his personal litigation expenses by the LLCs. Jim did not receive equal distributions. Joe's arguments that the money received was not directly paid to him and were for services rendered by Joe to A Plus LLC and so they are not distributions does not escape the application here as distributions can be direct or indirect and can be with or without consideration.

Jim, accordingly, had a right to receive equal compensation from the LLCs under the governing statutes in addition to the brothers' contract for equal compensation.

Accordingly, Jim is entitled to an award of damages to compensate him for Joe's breaches of the equal compensation contract and as mandated by Tennessee's Limited Liability Companies statutes, specifically T.C.A. §§48-220-101, §44-202-101(17), §48-236-101, §48-236-102 and §48-202-101(15).

***

Jim carried his burden to demonstrate that A Plus LLC should be dissolved pursuant to T.C.A. §48-245-901 because of Joe's actions and inactions related to A Plus LLC. The court finds that, to preserve value in A Plus LLC and A Plus Inc., Jim and Joe should no longer be co-owners of these entities, but that avoidable losses would be sustained through liquidation. In accordance with Jim's request to avoid liquidation of A Plus LLC to preserve value for the brothers and to ensure the debt owing to Dennis

and JoAnn is paid and pursuant to this court's broad discretion under the statutes, the court orders the exchange of Joe's shares in A Plus Inc. (which is 49%) and Jim's membership interests (which is 50% in A Plus LLC). This will result in Jim being the sole shareholder of A Plus Inc. and Joe the sole member of A Plus LLC and each business will continue to be a going concern and avoid the costs and losses associated with liquidation. Jim and Joe will each take ownership of their respective entities subject to all assets, liabilities, and other conditions. Joe is also ordered to make his unpaid capital contribution of $9,800 to A Plus, Inc. within thirty (30) days of this judgment. The exchange of these ownership interests will avoid expenses and losses associated with liquidation and will also result in Jim being the sole owner of A Plus Inc, which he has effectively managed since August 2015, and Joe being the sole owner of A Plus LLC, which Joe has managed since August 2015 and which he testified is poised to be more successful when the right time comes.

***

Jim, as the party that sought the dissolution of the LLCs, which has been awarded due to Joe's misconduct, is awarded his "reasonable costs, including attorney fees." The court finds the award of attorney's fees and litigation expenses to be proper and equitable under the circumstances as 1) Jim made every reasonable attempt to resolve disputes between the brothers related to the Jointly Owned Companies without resorting to filing suit and Joe refused to engage in those discussions; 2) Joe misused the money belonging to A Plus LLC, ACE-VA, and ACE-SC to fund his personal litigation expenses without Jim's consent; (3) the court finds that many of Joe's positions during this litigation lacked credibility, for the reasons set out above. Specifically, not paying the notes when he knew the notes were due, advancing funds to himself, and arguing that he needed to terminate his parents' employment due to a difficult financial position of the businesses, paying himself on a note owed to himself for the purchase of a home, while not paying notes owed to his parents and/or his brother, along with other items of proof, all cause the court to question Joe's credibility and legal positions he has taken during this litigation; (4) the court finds that Joe has acted both willfully and maliciously toward both his parents and his brother, both before and after this lawsuit was filed; and (5) the court finds that Joe is guilty of self-dealing with respect to jointly owned companies.

***

-11-

The court concludes that pursuant to T.C.A. §48-245-901, that this court has the equitable powers to grant Jim the judgments previously set forth in this Memorandum Opinion; i.e., that this court could award Jim the equal financial benefits, the legal and expert witness fees, the service fees, the damages from failure to timely pay debt, and the failure of Joe to make his initial capital contribution, pursuant to T.C.A. §48-245-901 and §48-245-902. The court, accordingly, awards such damages to Jim against Joe under this legal theory as well, but this award is just an alternative basis for the judgments and does not increase the amount of the judgments.

(Internal record citations omitted). Joe settled his claims with Dennis and JoAnn. In August 2023, the Trial Court entered an agreed final order confirming that it had ruled on all pending matters. Joe timely appealed to this Court.

## **Discussion**

We restate and consolidate Joe's issues as follows: 1) whether the Trial Court erred in awarding Jim equal compensation damages; 2) whether the Trial Court erred in awarding Jim damages based on Joe's failure to timely repay company debt; 3) whether the Trial Court erred in awarding other damages to Jim based on claims that are derivative in nature; 4) whether the Trial Court erred by divesting Joe of his shares of a corporation under the Tennessee LLC Act and ordering Joe to transfer those shares to Jim in exchange for Jim's memberships interests in an LLC without authority or valuation of the interests; and 5) whether the Trial Court erred in its award of attorney's fees and expert expenses to Jim. For his part, Jim raises separate issues of 1) whether Joe has waived certain of his issues and 2) whether this Court should award Jim his attorney's fees under the LLC Act's dissolution statute for post-trial and appellate work.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). The abuse of discretion standard also is implicated in this appeal. In *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Tennessee Supreme Court discussed the abuse of discretion standard at length, stating:

The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d

189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d [22,] 42 [(Tenn. 2005)].

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v.*

*Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

We first address Jim's issue of whether Joe waived certain issues on appeal. Jim notes that the Trial Court found, as an alternative basis for its judgment, that Jim was entitled to equitable relief under Tenn. Code Ann. § 48-245-901, which provides that "[a] court may grant any equitable relief it considers just and reasonable in the circumstances or may dissolve an LLC and/or direct that the dissolved entity be merged into another or new LLC or other entity on the terms and conditions the court deems equitable." Joe did not specifically raise an issue concerning this aspect of the Trial Court's judgment, which rested upon multiple grounds. Jim invokes independent ground waiver as a reason to affirm the Trial Court as to almost all damages awarded. We have stated "that where a trial court provides more than one separate and independent ground for its judgment and a party fails to appeal one or more of the independent grounds, we must affirm the judgment of the trial court on the ground that was not challenged on appeal." *Buckley v. Elephant Sanctuary in Tennessee, Inc.*, 639 S.W.3d 38, 55 (Tenn. Ct. App. 2021).

For independent ground waiver to apply, the unaddressed ground must independently sustain the judgment. Here, the Trial Court's authority to provide "equitable relief" incidental to the dissolution of an LLC did not serve as an independent ground for its award of compensatory damages. Instead, this alternative ground was dependent upon, and fully intertwined with, the Trial Court's findings regarding Joe and Jim's business relationship and Joe's alleged malicious actions toward Jim, matters which Joe adequately briefed. Therefore, we do not find independent ground waiver.

Jim argues further that Joe raised some issues too late, doing so only in his post-trial brief. However, the parties agreed, and the Trial Court approved, that the parties would forego closing argument and file post-trial briefs instead. Therefore, under these specific circumstances, Joe's choice to raise certain arguments for the first time in his post-trial brief is not a basis for waiver. The parties agreed and the Trial Court approved this practice. We find that all of Joe's issues are preserved and sufficiently presented.

Turning to Joe's issues, we address whether the Trial Court erred in awarding Jim equal compensation damages. The Trial Court found several grounds to sustain these damages. The primary ground was that of an alleged express oral agreement between Joe and Jim. It is undisputed that there was no written agreement. Regarding oral contracts, this Court has stated:

-14-

Unless required by law, contracts need not be in writing to be enforceable. While oral contracts are enforceable, persons seeking to enforce them must demonstrate (1) that the parties mutually assented to the terms of the contract and (2) that these terms are sufficiently definite to be enforceable. The mutual assent need not be manifested in writing. It may be manifested, in whole or in part, by the parties' spoken words or by their actions or inactions. It should not, however, be inferred from the unilateral acts of one party or by an ambiguous course of dealing between the parties from which different inferences regarding the terms of the contract may be drawn. Mutual assent also may not rest solely on the uncommunicated intentions or states of mind of the contracting parties.

*Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) (citations omitted). We have stated further: "Generally, contracts can be either express, implied in fact, or implied in law. Express contracts and contracts implied in fact result from a meeting of the minds of the contracting parties; the parties mutually assent to the contract's terms." *River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 57 (Tenn. Ct. App. 2002). To be enforceable, "such contracts must be sufficiently definite and must be based on consideration." *Id.*

Jim testified that his purported agreement with Joe to equal compensation was "unspoken" and "just the way it's been." This is puzzling, since an express oral agreement entails some measure of communication. Despite this testimony by Jim, which the Trial Court credited, the Trial Court found an express oral agreement. Even accepting the Trial Court's credibility determinations in Jim's favor,[4] what Jim testified to was not a contract. Jim's credibility cannot substitute for the elements of a contract. There is no evidence of a meeting of the minds or consideration. What were the terms? And for how long? For example, were the brothers to continue to receive equal compensation if one stopped working with the businesses entirely while the other continued to work full time? Jim did not elaborate. On the contrary, the agreement was "unspoken." At most, the brothers had a certain way of doing things, and Jim holds an earnest belief that he was entitled to equal compensation no matter what. That Jim earnestly believes he and his brother contracted for equal compensation does not make it so. Based on this record, including Jim's testimony deemed credible by the Trial Court, Joe and Jim never reached an express oral agreement to be compensated equally. To the extent that Jim alleges an implied-in-fact contract, we find no evidence of a meeting of the minds between Jim and Joe to the purported agreement. The alleged agreement was "unspoken" and "just the way it's been."

---

[4] We do not disturb a trial court's credibility determinations absent clear and convincing evidence to the contrary. *Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). We find no such clear and convincing evidence here.

That does not amount to a contract. We, therefore, reverse the Trial Court's finding of an express oral agreement for equal compensation.

The Trial Court found several additional grounds to award Jim equal compensation damages—the LLC act's provision on distributions, intentional interference with business relationships, conversion, and breach of fiduciary duty. First, regarding Jim's alleged entitlement to his share of distributions, the Trial Court's finding that owners' compensation divided between the brothers amounted to an indirect distribution was in error. Salary and distribution are distinct concepts. A distribution is a transfer of funds "in respect of membership interests." Tenn. Code Ann. § 48-202-101(15). That definition does not accord with Joe's and Jim's compensation in the form of salary, as Reilly's testimony illuminates. While the Trial Court attempted to reconcile this by noting that distributions may be direct or indirect, the Trial Court's holding collapses the distinction between distribution and salary. It also is incongruent that Joe and Jim would report their salaries on W-2s for tax purposes over the years only for it to turn out that in hindsight these were distributions all along. The evidence preponderates against the Trial Court's findings relative to this ground. We conclude that Joe's and Jim's salary did not constitute distributions under the LLC Act.

Regarding intentional interference with business relationships, this claim requires the following:

> (1) [A]n existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (citation and footnotes omitted). The Trial Court found that "Jim proved Joe's improper motive and improper means as Joe maliciously harmed Jim and misused his position of control over the LLCs to effectuate the interference." The Trial Court found further that "the damages are identical as set forth in the breach of contract cause of action." In support of the Trial Court's findings, Jim cites evidence of Joe having instructed FOG employees not to talk to Jim; Joe hiring attorneys to investigate Jim on FOG's behalf; Joe barring Jim—a 50% owner—from hiring who he wanted; Joe transferring A Plus, LLC's money to EZ Rentals so he could shield it "from the legal claims" at issue in this lawsuit; Joe directing employees at FOG to cancel A Plus, Inc.'s product orders after Jim started operating that business; Joe having FOG employees interfere with A Plus, Inc.'s online presence such that the public

-16-

thought the company's stores were "permanently closed"; and Joe keeping Jim from receiving equal pay.  In response, Joe points out instances of Jim's continued opportunities to do business with the jointly owned companies, such as communicating with A Plus, LLC managers and employees; having equal access to company financials; being consulted on A Plus, LLC's year-end profits and bonuses; participating in monthly lease meetings; being involved in an A Plus, LLC customer account issue; addressing A Plus, LLC employee performance issues; and attending an A Plus, LLC regional managers' meeting.

In its detailed order, the Trial Court made multiple findings regarding Joe's malicious behavior toward Jim.  However, the record shows that the increased enmity between the brothers went both ways.  The Trial Court found that, since 2013, Joe and Jim have not agreed on general business operations and have been unable to agree on company management issues.  Joe and Jim have been at loggerheads, and each took measures to alter the conditions of their business relationship.  It was Jim's initiative, for instance, to assert control over A Plus, Inc. in 2015 and cut ties with FOG.  Joe and Jim's inability to cooperate is not tantamount to Joe intentionally interfering in Jim's business relationships. The evidence preponderates against the Trial Court's findings relative to this alternative ground.

Third, the Trial Court awarded Jim equal compensation based on conversion, which has been defined as the "appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights." *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012). However, Jim failed to prove that the money at issue belonged to him rather than their business entities.  Joe cannot be liable to Jim for conversion of funds that did not belong to Jim.

Fourth, the Trial Court awarded Jim equal compensation damages for breach of fiduciary duty.  Joe contends that he owed Jim no fiduciary duty.  Regarding the existence of a fiduciary duty in the LLC setting, this Court stated in *Lascassas Land Co., LLC v. Allen*:

> Tennessee Code Annotated section 48-240-102(a) provides for a "statutory fiduciary duty."  *Raleigh Commons, Inc. v. SWH, LLC*, No. W2011-01298-COA-R3-CV, 2013 WL 3329016, at *20 n.6 (Tenn. Ct. App. June 28, 2013). "The statute in question defines the fiduciary duty of members of a member-managed LLC as one owing to the LLC, not to individual members."[5]

---

[5] We note that under the revised LLC Act, mentioned above, "members of a member-managed LLC do owe fiduciary duties to each other, specifically the duties of loyalty and care." *Bridgeforth* [*v. Jones*], [No. M2013-01500-COA-R3-CV,] 2015 WL 336376, at *26 [(Tenn. Ct. App. Jan. 26, 2015)] (citing Tenn. Code Ann. § 48-249-403(a)-(c)).  This Court has also recognized that "a majority shareholder of an LLC stands

> *McGee v. Best*, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002). Specifically, Tennessee Code Annotated section 48-240-102(a) provides that a member of a member-managed LLC has a fiduciary duty to "'account *to the LLC* for any benefit, and hold as trustee for it any profits derived by the member without the consent of the other members from any transaction connected with the . . . conduct . . . of the LLC." *Commissioners of Powell-Clinch Util. Dist. v. Util. Mgmt. Review Bd.*, 427 S.W.3d 375, 388 (Tenn. Ct. App. 2013) (quoting Tenn. Code Ann. § 48-240-102(a)).

*Lascassas Land Co., LLC v. Allen*, No. M2017-01400-COA-R3-CV, 2018 WL 1733449, at *7 (Tenn. Ct. App. Apr. 10, 2018), *no appl. perm. appeal filed* (footnote in original but renumbered). "The revised [LLC] Act [only] applies to all LLCs formed after January 1, 2006, and to LLCs formed prior to that date if they expressly choose to be governed by the revised Act." *Id.* at *5 n.6.[6] Tennessee's Revised Limited Liability Company Act does not apply to the LLCs at issue here.

Jim argues nevertheless that there is an exception to the older general rule that equal members of a member-managed LLC do not owe one other a fiduciary duty—the so-called "control exception." Jim cites *Intertherm, Inc. v. Olympic Homes Sys., Inc.*, 569 S.W.2d 467 (Tenn. Ct. App. 1978) for the proposition that an owner who controls or dominates a company can owe a fiduciary duty to another owner. The *Intertherm* court stated that "in accordance with the leading case of *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), that courts will closely scrutinize the transactions of a majority, dominant, or controlling shareholder with his corporation, and will place the burden of proof upon the shareholder when the good faith and fairness of such a transaction is challenged." *Id.* at 471-72. In response, Joe points out that *Intertherm* concerned corporations, not LLCs. Joe also cites *Hall v. Tenn. Dressed Beef Co.*, No. 01-A-01-9510-CH-00430, 1996 WL 355074,

---

in a fiduciary relationship to the minority[.]" *Anderson v. Wilder*, No. E2003-00460-COA-R3-CV, 2003 WL 22768666, at *6 (Tenn. Ct. App. Nov. 21, 2003). However, the revised Act does not apply to Lascassas, and this case does not involve a majority shareholder.

[6] The federal District Court for the Eastern District of Tennessee has observed:

> The Revised LLC Act "made sweeping revisions to the law regarding the operations of limited liability companies," *Rock Ivy Holding, LLC v. RC Props. LLC*, 464 S.W.3d 623, 635 (Tenn. Ct. App. 2014), including by creating a new framework "pursuant to which members of a member-managed LLC do owe fiduciary duties to each other, specifically the duties of loyalty and care." *Bridgeforth v. Jones*, No. M2013-1500-COA-R3-CV, 2015 WL 336376, at *26 (Tenn. Ct. App. Jan. 26, 2015) (citing Tenn. Code Ann. § 48-249-403(a)-(c)).

*Vaughn v. Taylor*, No. 2:21-cv-61, 2021 WL 6428005, at *5 (E.D. Tenn. June 15, 2021).

at *8 (Tenn. Ct. App. June 28, 1996), *rev'd on other grounds*, 957 S.W.2d 536 (Tenn. 1997), and this Court's statement that "William Hall has failed to cite any authority to support his proposition that one of two equal shareholders who 'controls' the company owes a fiduciary duty to the other equal shareholder as a result of their positions as shareholders. This court is unaware of any such rule of law."

Here, the jointly owned companies are owned equally by Joe and Jim. While the Trial Court found a litany of actions it deemed malicious by Joe toward Jim, that does not convert Joe into a controlling member. While Joe may have been more involved in company management than Jim, Joe was not able to dictate to Jim. Joe neither is a majority, dominant, nor controlling shareholder. To the extent that Jim stopped participating after 2015, he opted for this course. As co-equal owners of the jointly owned LLCs, and under the law in effect at their formation, Joe and Jim did not owe one another a fiduciary duty. The Trial Court erred in applying a control exception. On this and the other alternative grounds found by the Trial Court to award Jim equal compensation damages, we reverse the Trial Court's judgment.[7]

We next address whether the Trial Court erred in awarding Jim damages based on Joe's failure to timely repay company debt. Joe argues that this claim is derivative, and that Jim lacks standing to bring it as an individual. Regarding whether a claim belongs to an LLC or an individual, this Court has stated:

> It was Appellant's position at oral argument that this case does not involve a derivative action because the LLC is closely-held. Appellant cites no authority for this proposition, nor does he make this argument in his brief. It is not this Court's responsibility to make the parties' arguments for them. *Sneed v. Bd. of Prof'l Resp. of Supreme Court*, 301 S.W.3d 603 (Tenn. 2010). We do note, however, that this Court has previously been faced with a dispute between members of a closely-held family corporation and declined to "make an exception to the general rule prohibiting a shareholder from asserting a claim belonging to the corporation based on the fact that [it was] a subchapter S, closely-held corporation." *Keller*[*v. Estate of McRedmond*], 495 S.W.3d [852,] 881 [(Tenn. 2016)]. Thus, the size and nature of an LLC has little bearing on the nature of the litigation. Instead, "a court should look to the nature of the wrong and to whom the relief should go." *Id*. at 876 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004)).

---

[7] Elsewhere in his brief, Joe argues that Jim's claims sounding in fiduciary duty are barred by the three-year limitation period at Tenn. Code Ann. § 28-3-105 because Jim's claim accrued in 2013, and Jim only sued in April 2017. The Trial Court did not address this defense in the first instance, and neither will we. Our holding that Joe did not owe Jim a fiduciary duty is dispositive.

*Miller v. Miller*, No. W2022-00117-COA-R3-CV, 2023 WL 2017529, at \*4 (Tenn. Ct. App. Feb. 15, 2023), *no appl. perm. appeal filed*. Our guiding consideration is "'the nature of the wrong and to whom the relief should go.'" *Id*. (Quoting *Keller*, 495 S.W.3d at 876). "As with corporations, members of LLCs generally do not have standing to bring individual claims for harms to the LLC itself." *Vaughn*, 2021 WL 6428005, at \*4. Here, Joe's failure to pay A Plus, LLC's debt resulted in the company being liable for excess interest, not Jim personally. The nature of the wrong was directed toward the company, and the relief should have gone to the company. Therefore, this was a derivative claim that should have been brought on behalf of A Plus, LLC. We reverse.

Relatedly, we address whether the Trial Court erred in awarding other damages to Jim based on claims that are derivative in nature. These damages relate to the companies' payment of Joe's legal costs; excessive service fees paid by A Plus, LLC to E-Z Rentals; and Joe's failure to make a required capital contribution to A Plus, Inc. In each instance, the alleged wrongs were suffered by the companies, and the companies stood to receive the relief, thus these claims are derivative. We reverse the Trial Court's awards to Jim for these additional derivative claims.

We next address whether the Trial Court erred by divesting Joe of his shares of a corporation under the Tennessee LLC Act and ordering Joe to transfer those shares to Jim in exchange for Jim's memberships interests in an LLC without authority or valuation of the interests. The Trial Court ordered the exchange of Joe's shares in A Plus, Inc., or 49%, and Jim's membership interests, or 50% in A Plus, LLC. Joe argues that the Trial Court lacked authority to divest Joe of his shares of A Plus, Inc. under Tenn. Code Ann. § 48-245-901, and that corporations like A Plus, Inc. are governed instead by the Tennessee Business Corporation Act at Tenn. Code Ann. § 48-11-101. In response, Jim argues that "Joe's stock in A Plus Inc. is, like money or other property, simply an asset of value that the trial court ordered Joe to transfer to Jim in exchange for interests in an LLC." Nevertheless, Jim's argument overlooks the distinction between LLCs and corporations. While each is a form of business entity recognized under Tennessee law, they are not interchangeable. We hold that, without a proper statutory basis, the Trial Court lacked authority to divest Joe of his shares in a corporation. We therefore conclude that the Trial Court erred in ordering the asset exchange.

The last of Joe's issues we address is whether the Trial Court erred in its award of attorney's fees and expert expenses to Jim. We review for abuse of discretion. "An award of attorney's fees is considered to be within the sound discretion of the trial court, and will not be reversed on appeal if that discretion is not abused." *Smallman v. Smallman*, 689 S.W.3d 845, 877 (Tenn. Ct. App. 2023); *see also In re Linville*, No. M2000-01097-COA-R3-CV, 2000 WL 1785991, at \*5 (Tenn. Ct. App. Dec. 7, 2000), *no appl. perm. appeal*

*filed* ("We cannot find a clear abuse of discretion on the part of the trial court in awarding the appellee the fees of the expert witness."). Joe argues that the Trial Court erred by awarding Jim $1,155,560.65—the entirety of his attorneys' fees and expenses incurred in this lawsuit—based on Tenn. Code Ann. § 48-245-903(d), which provides:

> In a proceeding for dissolution by a member, the petitioner shall execute and file in the proceeding a bond, with sufficient surety, to cover the defendant's probable costs, including reasonable attorney fees, in defending the petition. The court shall determine the amount of the bond and may award to any party its reasonable costs, including attorney fees, if it finds for such party in the proceeding.

Tenn. Code Ann. § 48-245-903(d). Joe argues further that the award must be reversed because Jim failed to post a bond as required by statute.

We have described Tenn. Code Ann. § 48-245-903 as "a statute which allows for the award of reasonable attorney fees and costs to the prevailing party." *Daugherty v. Doyle*, No. M2013-02509-COA-R3-CV, 2014 WL 6453770, at *15 (Tenn. Ct. App. Nov. 17, 2014), *no appl. perm. appeal filed*. Joe contends that Tenn. Code Ann. § 48-245-903 did not give the Trial Court carte blanche to award Jim attorney's fees for his varied claims unrelated to dissolution. In response, Jim quotes an opinion from this Court for the proposition that, in an LLC dissolution proceeding, a court may grant any "equitable relief" it considers just and reasonable under the circumstances. *See ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

Jim relies on "equitable relief" to do more than it can. Jim's primary claims were based on his claims for equal compensation. The dissolution aspect of the case was a comparatively minor one. By granting Jim over one million dollars in attorney's fees and expenses based on the LLC dissolution statute's fee-shifting provision when most of the fees incurred were unrelated to dissolution, the Trial Court applied an incorrect legal standard. In addition, given our reversal of the Trial Court, there is no factual or legal basis for the award of attorney's fees and expenses to Jim, as Jim is not a prevailing party. For these reasons, the Trial Court's decision lacked a factual basis properly supported by evidence in the record, the Trial Court failed to properly identify and apply the most appropriate legal principles applicable to the decision, and the Trial Court's decision was not within the range of acceptable alternative dispositions. We reverse the Trial Court's award of attorney's fees and expenses to Jim.

The final issue we address is whether this Court should award Jim his attorney's fees under the LLC Act's dissolution statute for post-trial and appellate work. In view of the outcome of this appeal, we decline.

-21-

## **Conclusion**

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for further proceedings consistent with our Opinion as necessary and for collection of the costs below.  The costs on appeal are assessed against the Appellee, James W. Grubb.

_____
D. MICHAEL SWINEY, CHIEF JUDGE